# Henrici et al., Trustees, *v.* Davidson, Appellant.

*Replevin for timber cut—Statute of frauds—Parol agreement for the sale of land—Parties—Consideration—License—Mutual mistake—Fraud.*

Where an equitable ownership in land growing out of a parol contract is set up as a defence in an action of replevin brought to recover timber cut on the land, the defendants are actors and occupy precisely the same position as if they had filed a bill for a specific performance, and their rights must be so clearly established as to justify a chancellor in enforcing the alleged parol contract.

In the case of such parol agreement made without the assent of all the necessary parties, either side may withdraw until such assent has been given.

Where there is no consideration for such an agreement, a chancellor will not enforce it.

Although the defendants in such a case cannot maintain their equitable ownership in the land, yet a license to cut the timber, either expressed, or implied from knowledge and silence, granted during the pendency of negotiations by one of two trustees, owners as such of the land, would prevent a recovery as to timber cut before the license was revoked, unless the license was given under a mutual mistake as to a material fact or obtained by a fraudulent misrepresentation or concealment on the part of the defendants.

*Married woman—Conveyance of land—Nonjoinder of husband.*

The deed or conveyance of her land by a married woman, unless also executed by her husband, is void.

*Lunatic—Power of committee over real estate.*

The committee of a lunatic is limited in his power by act of assembly, and cannot convey or release any interest in land, unless authorized to do so by the court.

Argued May 4, 1892.   Appeal, No. 396, Jan. T., 1892, by defendants, Samuel Davidson, Thomas Davidson, Addison Davidson and L. D. Whitcomb, from judgment of C. P. Warren Co., June T., 1891, No. 6, on verdict for plaintiffs, Jacob Henrici and John S. Duss, trustees of the Harmony Society at Economy. Before PAXSON, C. J., STERRETT, GREEN, MCCOLLUM and MITCHELL, JJ.

Replevin for timber.

On the trial, it appeared that William Davidson's heirs were, among others, the three Davidson defendants and James Davidson, a lunatic, whose committee was Addison Davidson, and Loretta D. Appleton, wife of Harlan Appleton.

The charge of the court below, by NOYES, P. J., was as follows:

"On the 27th of February, 1891, a writ of replevin was issued out of this court at the suit of Jacob Henrici and John S. Duss, trustees of the Harmony Society, at Economy, against Samuel Davidson, Thomas Davidson, Addison Davidson and L. D. Whitcomb, and by virtue of this writ a quantity of pine and oak timber was seized by the sheriff. The defendants claimed the timber as their property, and, as they had a right to do, gave bonds to the sheriff, to appear and make good their claim; whereupon the timber was redelivered to them. The question to be determined in this case is, whether the property in the timber replevied was in the plaintiffs, or in the defendants.

"The timber was cut on lands known as tracts .5279 and 5280, in this county; and in order to show title to the timber, the plaintiffs introduce evidence by records, documents and other proof, that they, as trustees of the Harmony Society, were and are the owners of that land. This evidence is entirely uncontradicted, and it shows a valid legal title in the plaintiffs to the land in question, and by virtue of that ownership they are to be regarded as the owners of the timber taken therefrom, and hence entitled to recover in this action, unless prevented by facts shown on the part of the defendants.

"The defendants show no legal title to the land in question, but they claim that an equitable title was vested in Samuel, Thomas and Addison Davidson in common with others, by a parol, or verbal, agreement between them and their co-owners, heirs of Wm. Davidson, deceased, and Jacob Henrici and Jonathan Lenz, the then trustees of the Harmony Society; and that L. D. Whitcomb, so far as he had any possession of the timber, had it under the other defendants and their privies. Although such an agreement would not vest in them a legal title, such as is vested by deed, yet if in fact made, and in part executed, and the circumstances surrounding the transaction, and the character and amount of the proof are such that a court

of equity would enforce it against the trustees of the Harmony Society, then by the long established practice in Pennsylvania, it will be recognized in a court of law, and will constitute a good defence to this action.

"It is the duty of the jury to determine matters of fact, and of the court to determine questions of law. The nature of this part of the defendant's claim is such, that before the truth of their allegations can be submitted to you, we must determine whether the facts are such that a court of equity could establish and enforce the alleged parol contract.

"In general, no estate in lands, tenements or hereditaments, except leases not exceeding the term of three years, can be created without writing, by reason of the express provisions of the statute called the statute of frauds and perjuries, which for more than a century has been in force in this commonwealth. Such estates have the force of estates at will only, and are determinable at the will of either party.

"But as the statute was designated to prevent fraud, the court have controlled its effect so as not to permit it to be made the instrument of fraud. Under some circumstances, an agreement to sell land, not reduced to writing, may be enforced. Where there is clear, precise and indubitable proof that an agreement to sell land was made between the parties, upon a valuable consideration, the proof embracing all the terms of the contract; and the vendor has in part executed it, by delivering the exclusive possession of the land to the vendee, under the contract; and the vendee has paid, and the vendor received, the purchase money; or if not, where the vendee has made such valuable improvements that he could not be compensated in damages, and a rescission of the contract would be unjust, inequitable and practically a fraud, then it may be enforced notwithstanding the statute.

"Our first inquiry is, whether the evidence shows a contract fully made between the parties.

"The testimony of the defendants tends to show that in the fall of 1887, Samuel Davidson met Jacob Henrici, one of the trustees, and had a conversation, in which he asked Mr. Henrici whether he was going to fix up that land business up the Allegheny river satisfactory. That he told him unless it was fixed up he was going to bring suit. There is some evidence

that prior to this time Samuel Davidson and others, the heirs of Wm. Davidson, had made some claim to a large body of land, growing out of the rights or claims of their father. That subsequently Jonathan Lenz met Samuel Davidson in Warren county, and after some discussion offered a settlement, which was not at the time accepted; Samuel replying that he must consult the other heirs.

" Addison Davidson, another of the heirs, and one of the defendants, testifies that about December, 1887, he had an interview with Mr. Lenz, and another in the first week of January 1888. That Lenz proposed to give the heirs half the lands which had formerly been sold at sheriff's sale as the property of their father; which was communicated by him to his brothers and sisters, and they concluded to do it, and he so informed Lenz. There is evidence of subsequent meetings between Samuel and Thomas Davidson and Mr. Lenz, concerning the settlement; that a survey was made, which divided the land in a way which was unsatisfactory to both parties; and later another, which was according to their wishes. There is evidence that in the fall of 1888, or about the first of January, 1889,— and about this date I am a little uncertain whether all the witnesses gave it alike, but I believe it was so given by Thomas Davidson, and the circumstances would point to that as about the right time—there was a meeting between Henrici and Lenz and Samuel and Thomas Davidson, at Economy. That there was produced there by the trustees, a draft, exhibiting all the land in question, and a line showing the division of tract No. 5221, so as to divide the land into equal acreage; that Lenz and Henrici talked in German together, and then it was stated by Mr. Lenz and the Davidsons, that the land was to be divided, and the part to be allotted to each was pointed out and agreed to by all present. That it was further agreed that Judge Hice, the attorney of the trustees, should draw all the necessary papers.

[" There is no evidence that the other heirs of Wm. Davidson had authorized Samuel and Thomas to make the particular agreement, which it is claimed they did make. There is evidence that the heirs agreed to take half the land, but not that either agreed, or authorized any person to agree, to the particular contract now set up by the defendants.] [19]	A contract

such as this, in which there is no money consideration, but which consists of promises to perform specific acts, as the consideration for like promises on the other side, and where the performance requires the concurrent act of all the parties on each side, is not complete until all the parties whose assent is necessary have given such assent. So far as the evidence shows, only Samuel and Thomas, of the heirs of Wm. Davidson, gave their assent at the interview at Economy. There was, therefore, no complete contract at that time. Until the assent of all the necessary parties was given, either party might withdraw and decline to be bound by the propositions then made.

" It is not denied that subsequently a deed of release from the heirs of Wm. Davidson was drawn by Judge Hice, the person selected by both parties, and duly executed by all the heirs of Wm. Davidson, except two; and that Mrs. Appleton's interest was conveyed to Samuel Davidson before his execution of the deed to the trustees. It is not claimed that up to the time when this was done and the deed delivered to Judge Hice, that the trustees had done any act evincing an intention to withdraw from the bargain. This was an assent and ratification on the part of those so executing the deed, from the date of the execution and delivery of the deed to Judge Hice.

" But two of these heirs were under disability. One was a married woman and the other a lunatic. The married woman signed and acknowledged the deed, but her husband did not join. And the deed was also executed by Addison Davidson, the committee of James Davidson, the lunatic.

" The deed or conveyance of land by a married woman, unless also executed by her husband, is void. The committee of a lunatic is limited in his power and authority by act of assembly; and has no power or authority to convey or release any interest in lands, unless so ordered by the court.

" The execution by the married woman and the committee of the lunatic, in the manner shown, was not a valid assent, binding upon either to the contract alleged to have been made in their behalf; nor was it performance on the part of the married woman, or the lunatic. This suit was brought before the assent was given in a legal and binding form. Until so given the trustees might lawfully withdraw from the negotiations; and their act in bringing this suit was so inconsistent with its con-

tinuance that it must be regarded as a refusal to go on. The contract, as shown by the defendants, being thus wanting in mutuality, is not available as a defence to the defendants in this case.

"We think it is not available for another reason. The consideration for the contract is alleged to be the settlement of a doubtful right as to the ownership of the whole body of land, purchased in 1858, at sheriff's sale, as the property of Wm. Davidson. There is little evidence of the nature of this claim, but all that is proved concerning it shows that it was a claim made by Wm. Davidson after the sheriff's sale, and growing out of some agreement between himself and the trustees at the time of their purchase. No foundation whatever for such a claim is shown, and it appears by writings, signed and sealed, by Wm. Davidson, and Nancy, his wife, a few years before his death, that if in truth any such claim existed, it was compromised and settled to his full satisfaction, and upon a full consideration in his lifetime.

["There is no evidence that William Davidson, in his lifetime, made claim to any interest or right against the Harmony Society after this compromise and settlement. Nor that any facts existed, or were supposed to exist, which could give any color or shadow of right to his heirs.] [20]

"The alleged contract, being wholly verbal, and against the statute of frauds, must not only be clearly proved, and partly executed, but it should be conscionable, fair, and such as can appeal to the conscience of a chancellor to compel its execution.

["The evidence does not permit us to suppose that, knowing the defendants had no right, the trustees intended to make a gift; and it does not disclose such a doubtful right as would be a sufficient consideration to sustain a parol contract for the sale of lands. The evidence of defendants fails to establish such an equitable title to the land in question as will carry with it title to the timber cut.] [21]

"There remains, however, the question whether, apart from enforceable title to the land, the defendants have shown a right to cut and remove the timber in question, and to take and hold it as their own.

"There is evidence, tending to show that during the pendency of the negotiations we have referred to, permission was

given to the defendants—the Davidsons—to go into possession of the land; and to cut, remove, and sell timber therefrom. There is evidence that with the express consent of at least one of the trustees, the hemlock bark was taken by Mr. Wheeler, under the Davidsons. That at the time of the negotiations at Economy, the trustees were informed—I leave this to the recollection of the jury, possibly I am wrong—it seems to me now there was some evidence, at the time of the negotiations at Economy, when they had what is called the 'love feast,' that one of the Davidsons stated to the trustees they had been taking timber, and how much they were getting for it in the market; perhaps that was some other time.

" Mr. Ball : It was not at that time.

" The Court: Somewhere in the evidence there was some such testimony. Precisely what it was is for you to remember. And that they were told they had full possession, and might go on and they hoped they would do well. The facts relating to this branch of the case, are to be determined by you, upon the weight of the evidence.

" If you find, from the evidence, that the timber in question in this case was in fact cut and removed from the land, by the express consent of the trustees, even although such consent was given in the expectation that a contract for the land would be entered into, subsequently, and the consummation of the expected contract has been prevented by the withdrawal or refusal of the trustees, the plaintiffs are not entitled to recover. The liberty to cut timber could be terminated at the will of the trustees, but until so terminated, it was a protection to the defendants against such an action as the present. [But if you find from the weight of the evidence that the consent to take timber was given, but was induced by statements made by the defendants, or any of them, as to material facts, which were false and known to them to be false; or if it was given under a mutual mistake as to material facts on the part of the trustees, and those of the defendants who obtained it, then the trustees could not only terminate the liberty at their will, but can recover the timber taken from the land, in replevin.] [22]

[" The fact that Wm. Davidson and his wife had received full satisfaction for any claim against the Harmony Society, in his lifetime, and executed and delivered a full release and sat-

isfaction for such claims is a material one, and if all the parties acted in ignorance of that fact, or if the defendants knowing of it, suppressed it with fraudulent intent, and the liberty or license to take timber was thereby obtained from the trustees, it cannot avail the defendants in this case.] [23]

" There is evidence that Samuel Davidson testified at one time, that some question as to whether this claim had not been settled was raised, in conversation between himself and Mr. Lenz, that Mr. Lenz asked about his stepmother—calling her mother—and said that he would go and see mother, and if it had not been fixed up in the lifetime of his father, to his satisfaction, it must be done. And I think in the same conversation or some other, Mr. Davidson said to Lenz that he was not aware that it had been settled.

[" There is no direct evidence that Samuel Davidson had knowledge of this settlement. Whether there are any facts in the case, from which you can legitimately find that he had knowledge, I leave to you, from all the evidence, and all the circumstances, but I know of no direct evidence that he knew of it. There is evidence that Lenz, who was not trustee at the time of the settlement with Wm. Davidson, was informed by Judge Hice, that he believed such a settlement had been made and that it was probably recorded. The paper was in fact recorded in this county. Henrici was trustee at the time and a party to it.

" On the other hand, it is difficult to understand what should move the trustees to act as the defendants claim they did, if they had not forgotten that settlement. You must determine how this matter was, from the evidence.] [24]

[" The mistake which would entitle the plaintiffs to recover for timber taken by their consent, must have been a mutual one, and not caused by their own negligence, or recklessness ; and it ought to be pretty clearly made out by the evidence. But a mutual mistake as to such a material fact as the settlement in the lifetime of Wm. Davidson, would avoid not only a contract to sell land, but a license to cut timber.] [25]

\*     \*     \*     \*     \*     \*     \*     \*

" Now, gentlemen, the substance of these instructions may be stated in a few words. The question as to whether or not these defendants, the Davidsons, are the owners of the land

need not concern you at all.    We have decided that, so far as this case is concerned.

"The question is, whether, in the first place, the trustees of the Harmony society gave them permission to take possession of this land, and other lands?    Whether they knew that they were cutting timber?    Whether they authorized them, either by expressly telling them they might do so, or by knowing that they were doing so, and keeping silent with that knowledge?

"If that is so, [then you are to inquire whether that consent and license by the trustees was obtained fraudulently, by the statement to them of facts which were not true, and which the parties stating it knew were not true.    There is, as I have said, no direct evidence of such statement; there is no evidence that the Davidsons said that there had been no settlement or any other fact, that I now recall, that would amount to fraud, or any direct evidence showing their knowledge.    It is with some hesitation that I leave the question of fraud with you at all, but the case involves many facts, and if you are thoroughly satisfied that there was an intentional or fraudulent misrepresentation, or concealment of facts, on the part of Davidsons, that would avoid a license.] [26] [Then further, if there was no fraud, if the fact which appears without contradiction in the cause, that the controversy between Wm. Davidson, in his lifetime and the trustees had been settled to their entire satisfaction, and the Davidsons had no knowledge that it had been so settled, and the trustees had no knowledge that it had been so settled, had forgotten it—that is the only way we can conceive that they did not have knowledge of it—Mr. Henrici was a party to it—if that was the situation, was based upon such a mutual mistake, then the plaintiffs may recover.    But if they knew of it, and took their chances, even although the contract cannot be enforced so as to compel them to convey the land, it cannot be so rescinded as to take away from the Davidsons the timber which they had cut with the consent and knowledge of the trustees.] [27]

"If the plaintiffs are entitled to recover, the measure of damages is the value of the timber, less the amount which it has been enhanced in value by the labor of the defendants.

"This is substantially the value of the timber on the stump. I think you may add such an amount to that as you are satis-

fied is a fair compensation for the detention of the property, or the value of it, from the time of the replevin to the time you render your verdict, not exceeding the interest upon the value.

"As to the value, the evidence has been commented upon by the last counsel who addressed you ; and I need not go over it. Counsel for plaintiffs seem disposed to take the evidence of the defendants as to amount.   That was 50,952 feet of the good pine, and 5,380 feet of cull pine, one third of which was not replevied in this case.   I don't remember the amount of oak. The evidence as to value differs from 14 to 15 cents on the bank, on the part of plaintiffs ; to 9 or 10 cents, as given by the witnesses, on the part of defendants.   There is evidence that it cost 4 to 5 cents per cubic foot to take it from the stump to where it was found.

"If you find for the plaintiffs, under the facts we have submitted to you, you will compute what amount they are entitled to, and your verdict will be for that amount.   If you find for the defendants, it will simply be for defendants."

Question by Juror : "If it would be necessary to have consent of both trustees and all the other parties ? "

The Court : "It would not be necessary to have consent of all the other parties ; and I think the consent of one trustee, for license to take timber, would be sufficient."

The verdict was for the plaintiffs in the sum of $2,290.

*Errors assigned* were (19–27) the portions of the charge as above in brackets, quoting them.

The other errors assigned are immaterial.

*George A. Jenks*, with him *W. H. S. Thomson* and *Hinckley & Rice*, for appellants.

*William D. Brown* and *D. I. Ball*, for appellees.

OPINION BY MR. CHIEF JUSTICE PAXSON, May 23, 1892 :

We have carefully examined the thirty-three specifications of error in this case, and find nothing in any of them to justify us in reversing this judgment.   The suit below was a writ of replevin for a quantity of square timber, which the plaintiffs alleged had been cut upon their property without authority.   By way of defence the defendants set up an equitable title based upon an alleged parol agreement for the sale of the land from which the timber was taken.   The plaintiffs are the trustees of the Har-

mony Society, at Economy, Pa., and from the evidence it appears that at one time the real estate in controversy belonged to one William Davidson.   Mr. Davidson becoming heavily indebted to the Harmony Society, said tracts of land were sold at sheriff's sale, and purchased by the trustees of said society, prior to the year 1858.   The defendants contended that said purchase was made in trust for the said William Davidson, until such time as he should pay and discharge the indebtedness due said society, and that said indebtedness was fully paid in the lifetime of said Davidson.   This contention was not sustained by the evidence.   On the contrary, it appears that on December 27, 1867, William Davidson and his wife executed and delivered to the trustees, their heirs and assigns, a release and quitclaim deed of, in and to all the portions and tracts of land in controversy.   It also appeared that upon the same day William Davidson and wife acknowledged the receipt of $10,000, as a Christmas present from R. L. Baker and Jacob Henrici, trustees of the Harmony Society, for which, over their signatures, they expressed their gratitude and regret that anything should have occurred to have disturbed the friendship that existed between them and the society; they also disclaim any intention of ever desiring to injure the said trustees, or the worthy society they represent, and also disclaim having any title to, or interest in, any of the lands referred to.

The moving cause which induced the society to make this present to William Davidson does not clearly appear.   It does appear, however, that the land which they had purchased at the sheriff's sale had greatly increased in value, and in view of the known probity and fair dealing of the society, it is fair to assume, that the gift in question was a generous recognition of the increase in the value of the property.   Be that as it may, the transaction referred to was an end of all interest of William Davidson and his wife in the real estate in question.

The defendants are the children and heirs of William Davidson, deceased.   Many years after the release in question they renewed their claim to the property.   Whether they knew of the release and settlement made by their ancestor does not clearly appear, nor is it very important, excepting in the view that if they had such knowledge their claim was a fraud.   At the time this second claim was made, Jacob Henrici, one of the

trustees, was an old man, and it is entirely among possibilities
that he had forgotten the previous settlement. The other
trustee who participated in that settlement was deceased, and
John S. Duss, who is at present a cotrustee with Mr. Hen-
rici, may not have had actual knowledge of it. Under these
circumstances, the defendants set up an alleged parol agree-
ment with the trustees, by which the land in question, consist-
ing of some four thousand acres, was to be divided. It was
further alleged that in pursuance of this agreement a deed from
the heirs of William Davidson was executed, for their portion
of the land, in favor of the trustees.

It is very plain that this defence could not be successfully
maintained, unless the defendants' rights were so clearly estab-
lished as to justify a chancellor in enforcing the alleged parol
contract. In other words, as to the said contract, the defend-
ants are actors, and occupy precisely the same position as if
they had filed a bill for a specific performance.

There are several reasons why a chancellor would not en-
force this contract. It does not appear that all the heirs had
authorized Samuel and Thomas Davidson to make the particu-
lar agreement which it is claimed they did make. The assent
of all the necessary parties was not given, and until that is
done either of the parties might withdraw from it. The deed
referred to was not executed by all the heirs. Two of them
were under disability. One was a married woman, and the
other a lunatic. The married woman signed and acknowledged
the deed, but her husband did not join. The deed or convey-
ance of land by a married woman, unless also executed by her
husband, is void. The deed was also executed by Addison
Davidson, the committee of the lunatic. He had no authority
to execute this deed. The committee of a lunatic is limited in
his power by act of assembly, and cannot convey or release any
interest in land, unless authorized to do so by the court.

Aside from this, there was no consideration for this alleged
contract, and no chancellor would enforce it. Conceding, as
the most charitable view of the case, that all the parties had
forgotten the previous settlement, the fact remains, that the
heirs of William Davidson had not a particle of interest in this
property. There was no such dispute or controversy as would
sustain an executory agreement of compromise. The question,

whether, aside from the matter of title to the land, the plaintiffs authorized the defendants to cut the timber in controversy, was submitted to the jury under proper instructions.

All the important questions arising in the case were so fully discussed by the learned judge below in his charge to the jury that we do not deem it necessary to pursue the subject further.

Judgment affirmed.